UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

WILDERNESS CROSSINGS, LLC,                    Case No. DT 09-14547
                                              Chapter 11
        Debtor.

_____/

In re:

KL INVESTMENTS, LLC,                          Case No. DT 09-14548
                                              Chapter 11
        Debtor.

_____/

**OPINION AND ORDER DENYING UNITED STATES TRUSTEE'S
SECOND MOTIONS TO CONVERT CHAPTER 11 PROCEEDINGS TO CHAPTER 7**

PRESENT:   HONORABLE SCOTT W. DALES
                     United States Bankruptcy Judge

These matters come before the court on the Second Motion of United States Trustee to

Convert Chapter 11 Proceeding to Chapter 7, filed in each of the above captioned cases (DN 103

and 76, respectively, the "Conversion Motions").  Chapter 11 debtors-in-possession Wilderness

Crossings, LLC ("Wilderness") and KL Investments, LLC ("KL")[1] are closely related, though

legally distinct limited liability companies conducting business as a single enterprise.

Wilderness is the operating entity that runs a bowling alley and indoor family entertainment

business on real estate that KL owns in Grawn, Michigan; KL primarily holds property, real and

personal, that Wilderness uses in its family entertainment business.  Given this nexus, the court

consolidated the Conversion Motions for hearing and decision.

_____

[1] The court will refer to Wilderness and KL collectively as the "Debtors" throughout this Opinion and Order.

For the following reasons, the court will deny the Conversion Motions. This Opinion and Order constitutes the court's findings of fact and conclusions of law, in accordance with Bankruptcy Rules 7052 and 9014(c).

## I.  JURISDICTION

The court has jurisdiction over these Chapter 11 cases under 28 U.S.C. § 1334(a). Pursuant to 28 U.S.C. § 157(a), the United States District Court has referred the cases and all related proceedings to this court under LCivR. 83.2(a) (W.D. Mich.). Each of the Conversion Motions qualifies as a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O). Accordingly, the court has authority to enter a final judgment resolving these contested matters.

## II.  ANALYSIS

The Conversion Motions rely on 11 U.S.C. § 1112(b)(1), which provides in relevant part as follows:

> . . . absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1). Indeed, the statute provides that once a court finds "cause," dismissal or conversion is mandatory unless the court specifically identifies "unusual circumstances" establishing that conversion is not in the best interests of creditors or the estate.

The court held several hearings regarding the Conversion Motions, which were adjourned from time to time, originally with the consent of the United States Trustee ("UST"),[2] but eventually over the UST's objection. At each hearing, the Debtors argued that the cyclical

---

[2] By consenting to the adjournments, the UST waived the 30-day hearing requirement otherwise applicable under 11 U.S.C. § 1112(b)(3).

nature of their business as an indoor family entertainment and bowling center prevented them from showing a profit during the warmer months in Traverse City, an area of our state well-known for outdoor recreation and tourism.  The Debtors predicted, somewhat ironically, that when the weather turns cold and wintry, the sun will shine on their business.  Each month since July, 2010 when the UST filed the Conversion Motions, the Debtors sought an adjournment, arguing that their financial performance would improve in the fall, as bad weather would drive the entertainment-seeking public indoors.

At a hearing on October 20, 2010, the parties effectively stipulated that the UST had established cause to convert the cases under 11 U.S.C. § 1112(b) based upon, *inter alia*, the Debtors' history of negative net monthly income for each month after the petition date (except January 2010), their failure to make court-ordered adequate protection payments, and Wilderness's post-petition employment tax delinquencies.  *See* 11 U.S.C. § 1112(b)(4)(A), (D) and (E) (statutory examples of "cause").  Despite their stipulation, the Debtors argued that special or "unusual circumstances" exist enabling them to establish that conversion to Chapter 7 is not in the best interests of creditors and the estate.

The undefined term "unusual circumstances" as used in the statute contemplates conditions that are not common in Chapter 11 cases.  *In re Fall*, 405 B.R. 863, 870 (Bankr. N.D. Ohio 2008); *In re Products International Co.,* 395 B.R. 101, 109 (Bankr. D. Ariz. 2008); *In re Fisher*, 2008 WL 1775123 (Bankr. D. Mont. 2008).  Courts, citing a leading bankruptcy treatise, have explained:

> Although section 1112(b) does not define the phrase "unusual circumstances," it clearly contemplates conditions that are not common in most chapter 11 cases.  Although each chapter 11 case is to some extent unique, and unusual circumstances may exist in any particular case regardless of its size or complexity, the import of section 1112(b) is that, if cause exists, the case should be converted or dismissed unless unusual facts or

> circumstances demonstrate that the purposes of chapter 11 would be better served by maintaining the case as a chapter 11 proceeding.

*See, e.g., In re Fall*, 405 B.R. at 870 (*citing* Collier on Bankruptcy).  To meet the challenge of establishing unusual circumstances in the face of the Debtors' concession that cause exists to convert the case, Debtors' counsel advised that his clients were on the verge of brokering a deal with a new "white knight" lender who would assist them in reorganizing their business.  Although usually skeptical about such arguments, the court adjourned the hearing, over the UST's objection, given the Debtors' counsel's reputation for integrity and the significant creditor support for the adjournment over immediate conversion.

At the adjourned hearing on November 16, 2010, Debtors' counsel reported that as predicted, a new lender had just wire-transferred $2.34 million to a client-trust account to be used to purchase the lions' share of secured claims against the Debtors.  Depending upon the outcome of the Conversion Motions, a new lender named James Umphrey intends to purchase the claims of the Debtors' principal lenders, including Zions First National Bank ("Zions") -- the entity the Debtors blamed for refusing to convert a construction loan into long-term debt, thereby forcing them into bankruptcy.

According to a document the Debtors presented at the hearing entitled "Projected Plan Payments Upon Conclusion of Refinancing With James Umphrey," Mr. Umphrey will have a claim in the amount of $2,343,000.00 after purchasing the claims of Zions and Brunswick Bowling & Billiards Corporation ("Brunswick") at a discount.  Though the transaction will take the form of claims trading, it may effectively function as a refinancing of Zions's and Brunswick's debts to the extent Mr. Umphrey has agreed to reduce principal or restructure other terms.  From counsel's report, it appears the Debtors have brokered a deal between the new lender and the Debtors' three primary secured creditors, Zions, Brunswick, and the Internal

Revenue Service ("IRS").  Each of the secured creditors agreed to substantial discounts in anticipation of receiving payments either from the new lender (who intends to purchase claims), or in connection with the Debtors' proposed plan.  In order for the Debtors' bankruptcy estates to receive any benefit from this brokered-claims trade and discount, however, the Debtors must remain in Chapter 11.  Understandably, the new lender is not willing to put his investment at risk if the estates are headed to liquidation under Chapter 7, because the lender evidently perceives a return on investment only if the Debtors are permitted to reorganize and continue operating.

According to KL's Schedule D, Zions and Brunswick have asserted claims totaling $3,650,367.00.  *See* Doc. No. 32 (Case No. 09-14548); Fed. R. Evid. 201.  Thus, it appears the Debtors' refinancing transaction with Mr. Umphrey will reduce their debt load by approximately $1.3 million.  This is an unusually large reduction, which promises substantial assistance to the Debtors in their reorganization effort.

At the November 16, 2010 hearing, after reporting the $2.3 million wire transfer from the white-knight lender, the Debtors called four witnesses who further supported their contention that "unusual circumstances" exist, making conversion unwarranted in this case.

First, the Debtors offered the testimony of Ms. Deborah A. Steinbeck, a certified public accountant whom the court has appointed as a professional in these cases.  Ms. Steinbeck testified that she has been affiliated with the Debtors since 2008, prior to Debtors' filing their voluntary Chapter 11 petitions.  She credibly expressed familiarity with the business and explained Exhibit A -- her worksheet showing various adjustments she made to the Debtors' financial reports for the ten month period ending October 31, 2010.  Conceding that most of the Debtors' monthly operating reports ("MOR") showed a negative net income each month, she attributed much of that loss to depreciation expense and "rent" or interest expense that the

Debtors have been paying as adequate protection to Zions, Brunswick, and the IRS.  Because, as a practical matter, the Debtors are operating as a single entity, they have structured their affairs so that Wilderness makes "rent" payments to KL in amounts necessary to permit KL to make debt service payments to Zions and Brunswick.  She explained that by adjusting the MORs to remove expenses such as depreciation and debt service, the court would see that the Debtors (or more specifically Wilderness) could spin off enough income to service the Debtors' restructured debt obligations.

Specifically, Ms. Steinbeck made various adjustments to arrive at the Debtors' earnings before interest, taxes, depreciation and amortization or "EBITDA," a figure that lenders and other investors sometimes use to evaluate an entity's profitability.  The Debtors' combined EBITDA figure shows adjusted earnings in the amount of $229,437.06 during the first ten months of 2010, and $259,360.63 for 2009.  She testified that, according to the Debtors' projections based on the agreement with the new proposed lender, the Debtors would need $18,767.80 per month to service debt.  According to Ms. Steinbeck, the Debtors' EBITDA shows that they can service this refinanced debt load.

Even though an entity's EBITDA is an approximate measure of its profitability, and an indication of its ability to service debt, by no means does it paint a complete financial picture.  It can, however, suggest profitability that may be obscured by extraordinarily large non-cash expenses such as depreciation or existing financing arrangements.

Ms. Steinbeck also proposed that the Debtors make various adjustments for extraordinary one-time expenses incurred as a consequence of the bankruptcy.  For example, she adjusted the Debtors' bottom line to remove an appraisal expense of $8,600.00, as well as the Chapter 11 professional and UST fees.  She also made cost adjustments to isolate unusual advertising

**Page 7 of 12**

expenses that Wilderness has incurred to combat some of the "bankruptcy stigma" that has induced the public to bowl or celebrate or otherwise entertain themselves elsewhere -- approximately $22,300.00 during 2010 so far.

Another significant adjustment she proposed was to hypothesize a 9.5% increase in sales over the Debtors' actual experience during the ten month post-petition period. This figure represents the accountant's estimate or "guess" of the loss in sales that Wilderness suffered as a result of the pendency of this bankruptcy case.

As reflected in Exhibit A, Ms. Steinbeck has also proposed that Wilderness make changes to its employee scheduling procedures by instituting "on-call" staffing. As Ms. Steinbeck explained, and as the Debtors have begun to implement, some of the employees, instead of reporting to work for every shift, would be on-call and available to work (and be paid) only if the traffic justified additional staffing. As noted above, with these adjustments the accountant estimated the Debtors would have more than $18,767.00 they need to service their debts each month.

The UST, through cross-examination, sought to discredit the accountant's estimate by inducing her to concede that the 9.5% sales figure adjustment (reflecting lost sales attributable to the supposed bankruptcy stigma) was a "guess." Indeed, this adjustment struck the court as somewhat speculative.

Nevertheless, the accountant testified that the Debtors have lost revenue as a result of the bankruptcy -- a fact that Mr. Bernard F. Bader, an unsecured creditor, corroborated by referring to at least one bowling league that booked its lanes elsewhere because of concerns about the Debtors' bankruptcy. It seems reasonable to infer that the Debtors' sales will improve once the public is no longer confused about the effect of bankruptcy on their ability to remain open

through the busy season, even if the magnitude of the adjustment is difficult to quantify. The court credits Ms. Steinbeck's and Mr. Bader's observations about diminished traffic following the filing of the Debtors' bankruptcy petitions, and infers the Debtors' sales will improve after confirmation, if the court permits them to remain in Chapter 11.

The other creditor-witnesses who testified all opposed conversion. For example, William G. Tenbrink, who holds three promissory notes from the Debtors, said Traverse City needs a family entertainment business, especially during the cold months, and he believed much of the Debtors' problems stemmed from not being able to convert Zions's construction loan into more manageable term financing. Mr. Bader, also an unsecured creditor, advised the court that the Debtors' business is cyclical and bound to improve during the winter months. He said the business does well six months each year, and suffers six months each year, depending upon the weather. Testimony suggested that unusually warm autumn weather this year has hurt the Debtors' sales by inducing the public to remain outdoors longer than usual.

Finally, Frederick Moomey, the president of Flex Capital, also opposed conversion, even though his company holds a security interest in the Debtors' liquor license. Based upon his banking background and familiarity with the Debtors' operations, he also believes the Debtors can be profitable despite the cyclical nature of their business.

The testimony of these creditors was admittedly general, and optimistic. These creditors seemed acquainted with the Debtors' principals, and hoped for their success for reasons of personal affinity, as well as a means of getting paid. Nevertheless, the court regards the testimony as significant because it demonstrates substantial creditor commitment to reorganization over liquidation.

The principal unusual circumstance advanced by the Debtors is the fact that Mr. Umphrey has wire-transferred into counsel's attorney trust account over $2.3 million to be used to purchase the claims of Zions and Brunswick at a discount. In addition, the IRS's counsel reported that the agency has agreed to discount its claim by waiving the right to approximately $54,000.00 in penalties. The court finds that these discounts and the substantial wire-transfer, coupled with the substantial creditor support for reorganization expressed at the hearing, all amount to exceptional circumstances. The fact that a new lender is willing to advance $2.343 million to purchase the secured claims of the Debtors' former construction and equipment lenders permits a favorable inference regarding the prospects for this Debtors' reorganization. It seems unlikely that a third party would part with over $2.3 million, and voluntarily become the single-largest creditor of these Debtors, unless there was a viable business model and significant prospect for return on investment through reorganization.

The Debtors' Disclosure Statement reports that the unwillingness of Zions to convert its construction loan into more traditional long-term financing precipitated the Debtors' bankruptcy filing by unnecessarily prolonging the Debtors' obligation to service a more-expensive construction loan as opposed to a less-expensive term loan. The Debtors' court-appointed accountant also confirmed this assertion in her credible testimony, as did several of the testifying creditors. Counsel suggested without substantial controversy that Mr. Umphrey is more receptive to revising or modifying the terms of repayment than his assignor, Zions, and that he intends to purchase the claims at a substantial (*i.e.* $1.3 million) discount. This supposed willingness to negotiate with the Debtors -- evidenced by the wire-transfer and the IRS's resulting agreement to waive approximately $54,000.00 in penalties -- is truly an unusual circumstance.

The court applauds the UST's vigilance in monitoring Chapter 11 bankruptcy proceedings and exercising its prerogative to seek conversion of cases from Chapter 11 to Chapter 7 when post-petition operations threaten to create secondary insolvency or promise no realistic prospect for reorganization. In this case, however, after interrogating counsel at the conversion hearing, and after learning from the IRS's counsel that the Debtors' post-petition tax obligations are current, the court is less concerned about secondary insolvency. In other words, Debtors' counsel has satisfied the court that the Debtors are meeting post-petition payment obligations to the United States and other post-petition creditors. Moreover, the testimony established significant opposition to conversion from secured and unsecured creditors alike, entities with more at stake in this proceeding than the UST's admittedly significant duty to ensure fidelity to the Bankruptcy Code and Rules.

As the court observed during the conversion hearing, in many respects, the hearing causes the court to consider the prospects for reorganization in much the same way that it considers feasibility at a confirmation hearing. Certainly, nine months of post-petition operating losses, as reflected in most of the MORs, presents a significant hurdle for confirmation with respect to the requirement under 11 U.S.C. § 1129(a)(11) to establish feasibility. Although the court agrees with the UST that the accountant's calculation of EBITDA and some other adjustments is less than scientific, it credits the testimony to the extent the Debtors' EBITDA suggests their ability to service the debt as reduced to reflect the various negotiated discounts. Viewing the totality of the circumstances, and given the arrival of the incoming lender, the court finds that the Debtors have established unusual circumstances, and that conversion is not in the best interests of the creditors and the estate.[3] Nothing in this opinion, however, should be

---

[3] Finding unusual circumstances under 11 U.S.C. § 1112(b)(1) makes it unnecessary to consider whether the Debtors can also establish the exception prescribed in 11 U.S.C. § 1112(b)(2).

construed as finding that the Debtors' plans are feasible.  The court will address that issue at confirmation.

### III.  CONCLUSION AND ORDER

Despite finding unusual circumstances under 11 U.S.C. § 1112(b)(1), the court shares the UST's concerns about the Debtors' post-petition performance.  Even recognizing the cyclical nature of the Debtors' business and crediting the testimony that performance will improve during the winter months, the court believes that a prompt confirmation hearing is in the best interests of the creditors, the Debtors and the estate.  Accordingly, the court will deny the UST's Conversion Motions, but will impose a deadline for filing and obtaining approval of a modified plan of reorganization.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Conversion Motions are DENIED.

IT IS FURTHER ORDERED that the Debtors shall file an amended plan and disclosure statement reflecting the refinancing transaction with Mr. Umphrey on or before December 15, 2010, or such later time as the court permits, for good cause, by order obtained on notice to the UST and other interested parties.

IT IS FURTHER ORDERED that the Debtors shall be prepared for confirmation hearings to be held not later than March 16, 2011, or such later time as the court permits, for good cause, by order obtained on notice to the UST and other interested parties.

IT IS FURTHER ORDERED that the Clerk shall enter a copy of this Opinion and Order in the docket of each of the above-captioned Chapter 11 cases.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion and Order pursuant to Bankruptcy Rule 9022 and LBR 5005-4 upon Michelle Wilson, Esq., Michael

Corcoran, Esq., Robert A. Stariha, Esq., Agnes Kempker-Cloyd, Esq., the twenty-largest creditors of each of the Debtors, and all other parties who have made appearances in these two matters.

END OF ORDER

**IT IS SO ORDERED.**      Scott W. Dales
United States Bankruptcy Judge

**Dated: November 23, 2010**